# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                           No.15-CR-01015 MV

ALFREDO BARRAZA,

      Defendant.

---

*Appearances:*

| *For the United States:* | *For the Defendant:* |
|---|---|
| DAMON P. MARTINEZ | STEPHEN P. MCCUE |
| United States Attorney | Federal Public Defender |
| 201 3rd Street NW | 111 Lomas NW |
| Suite 900 | Suite 501 |
| Albuquerque, NM  87114 | Albuquerque, NM 87102 |
| | |
| *By:* JOEL MEYERS | *By:*  MICHAEL A. KEEFE |
| Assistant United States Attorney | Assistant Federal Public Defender |
| KRISTOPHER HOUGHTON | KURT MAYER |
| Assistant United States Attorney | Assistant Federal Public Defender |

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Alfredo Barraza's Motion to Suppress Evidence (the Motion) related to the inventory search of a parked vehicle in which Mr. Barraza was seated as well as oral statements from Mr. Barraza after the arresting officer attempted to Mirandize him [Doc. 45].  The government responded to the Motion [Doc. 51] and Mr. Barraza replied [Doc. 52].  The government also submitted supplemental briefing on the

issue of standing, [Doc. 60], to which Mr. Barraza submitted a supplemental reply [Doc. 61]. The Court held a hearing on this motion on April 28, 2016 and ordered that the parties submit their closing arguments in writing [*see* Doc. 63].   Both parties submitted their written closing arguments on May 12, 2016 [Doc. 66–67].

The Court, having considered the motions, briefs, relevant law, closing arguments, and being otherwise fully informed, finds that Mr. Barraza's Motion will be **GRANTED**.

## BACKGROUND

On December 16, 2014, Officer Shultz of the Albuquerque Police Department was patrolling a neighborhood in the southeastern portion of Albuquerque, New Mexico in response to a high volume of vehicle break-ins in the area.  Doc. 63, Tr. at 20–26 ("we'd been having issues with auto burglaries and auto thefts in this area.  What we were seeing was vehicle break-ins, where people would either force entry by damaging a window or popping a lock to a vehicle, gaining entry, [and] taking property out.").  At that time, the Albuquerque Police Department received over two calls a day reporting auto burglaries in that portion of Albuquerque.  *Id.* at 24. Responding to the high volume of auto thefts, Officer Shultz developed a "Tact[ical] Plan" to patrol the area for vehicular theft and burglary, including a map of Officer Shultz's intended patrol radius.  *Id.* at 25; Ex 1, Tact. Plan Map.

At approximately 2:30 p.m., Officer Shultz saw the Defendant, Mr. Barraza, sitting in the driver's seat of a parked red Cadillac, staring at Officer Shultz in an "odd" manner.  *Id.* at 28. Although Mr. Barraza was in the driver's seat of the Cadillac, the Cadillac was parked along the curb in front of Cynthia Jaramillo's apartment, where Mr. Barraza sometimes stayed.  *Id.* at 108–

2

09.[1]   Officer Shultz pulled in behind the parked Cadillac and noted that the registration was expired and the license plate was registered to a woman named Claudia Herrera.  *Id.* at 28.   Ms. Herrera is Mr. Barraza's sister and registered owner of the Cadillac.  Doc. 63, Hearing Tr., at 8.  Mr. Barraza attempted to exit the vehicle, whereupon Officer Shultz turned on his police lights, instructed Mr. Barraza to remain in the vehicle, and asked Mr. Barraza for proof of the vehicle's registration.  Ex. 3-1; Doc. 63, Hearing Tr., at 28.  Mr. Barraza informed the officer that he did not have the documentation and was not driving the parked Cadillac.  Ex. 3-1.

Mr. Barraza then gave the officer false identifying information and Officer Shultz was resultantly unable to identify Mr. Barraza.  Doc. 63, Hearing Tr., at 34.   Upon further questioning, Mr. Barraza gave Officer Shultz a second set of false identifying information and then attempted to flee from Officer Shultz.  *Id.* at 35–37.  Officer Shultz called for backup, chased down Mr. Barraza, and handcuffed him, *id.* whereupon Mr. Barraza gave Mr. Shultz his correct identifying information.  *Id.* at 39–40.   The firearm at issue in this suppression was not visible from the exterior of the vehicle during Officer Shultz's questioning.  Doc. 67, US Closing Brief, at 4.

Unbeknownst to Officer Shultz, Ms. Herrera had loaned the Cadillac at issue in this case to Mr. Barraza and Mr. Barraza was making payments to Ms. Herrera on the Cadillac with the intention of purchasing it.  Doc. 63, Hearing Tr., at 8–9.  On the day Officer Shultz arrested Mr. Barraza, Mr. Barraza had parked the Cadillac in front of the apartment he used to live in with a woman named "Jenny."  *Id.* at 108, 118.  Although Mr. Barraza no longer lived in the apartment

[1] Ms. Jaramillo often parked her car in the spot where the Cadillac was parked.  Doc. 63, Hearing Tr., at 116–17.

with Jenny, he had moved his personal property into an adjacent unit rented by Cynthia Jaramillo and her husband. *Id.* at 120. Mr. Barraza stayed with Ms. Jaramillo three-to-four nights a week because he "had nowhere to go." *Id.* at 120 – 21.

Upon running Mr. Barraza's correct information, Officer Shultz determined that Mr. Barraza had a felony warrant out for his arrest. *Id.* at 39–40. Officer Shultz also consulted with the other officers on the scene (who arrived in response to Officer Shultz's backup call) regarding whether Officer Shultz had probable cause to search Mr. Barraza's vehicle. *Id.* at 49–50. Although Officer Shultz recorded much of the arrest and the resulting search with a video-camera, see Exs. 3-1–3-9, Officer Shultz did not record his conversation with the other officers regarding why he was considering searching the vehicle or whether he had probable cause to do so. Doc. 67, US Closing Brief, at 6 (citing Doc. 63, Hearing Tr., at 56–57). Explaining the conversation, Officer Shultz testified that:

> There were a couple of detectives and supervisors that had showed up on the scene, mostly because foot chases attract attention so they wanted to check on me. While they're there, I asked if we had enough for a warrant. And they said, Probably [sic] not, since we can't tell for sure that there's stolen property or a firearm inside the vehicle just from looking at it.

Doc. 63, Hearing Tr., at 49–50. Officer Shultz did testify under oath that he was "not 'interested in searching the car' for evidence, but merely 'interested in securing the car.'"

After Officer Shultz's discussion regarding whether he had probable cause to search the vehicle, Officer Shultz returned to the curb where Mr. Barraza sat handcuffed and read Mr. Barraza his *Miranda* rights. Doc. 63, Hearing Tr., at 53. Officer Shultz then proceeded to ask Mr. Barraza what he wanted the police to do with the Cadillac. Ex. 3-5; Ex. 3-6. Initially, Mr. Barraza resisted leaving the car on the street, stating "they'll fucking rob my . . . they'll steal my

sister's car, man. . . . Look at the neighborhood." *Id.*  However, once Officer Shultz informed

Mr. Barraza that he was considering impounding the vehicle, Mr. Barraza stated that he did not

want it impounded and offered several alternatives to impoundment.  *Id.*  The alternatives offered

by Mr. Barraza including leaving the Cadillac parked at the curb, Doc. 63, Hearing Tr., at 80,

moving the car into the adjacent parking lot that contained security cameras, *id.* turning the

Cadillac over to Ms. Jaramillo, *id.* at 87, 110–12, 132–33, and leaving it in place for several

hours until Ms. Herrera could take custody of it, *id.* at 112, 114–15.

Throughout the interrogation, Ms. Jaramillo attempted to contact Ms. Herrera to take

possession of the car pursuant to Mr. Barraza's requests.  *Id.* at 113–16.  Officer Shultz later

discovered that Mr. Barraza's sister was in Alamogordo, over three hour's drive from

Albuquerque.  *Id.* at 9, 17.

After this discussion with Mr. Barraza, Officer Shultz began conducting an inventory

search.  Doc. 67, US Closing Br., at 7.  During the search, Officer Shultz found a shotgun and

ammunition, whereupon another officer on the scene stated "this is why we just tow the cars."

Ex. 3-7.  After finding the shotgun, the Albuquerque Police Department continued the search

until they believed they had found all of the high value items and completed a "Tow-Report"

inventorying the high value property within the vehicle.  Ex. 5.

## ANALYSIS

### I.       "Standing"[2] to Contest the Seizure

---

[2] While the parties, as well many of the Fourth Amendment cases, refer to a defendant's "standing" to challenge a search or seizure, the Supreme Court has repeatedly admonished that the "'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that

A defendant can challenge a search under the Fourth Amendment if "the defendant manifested a subjective expectation of privacy in the area searched and [if] society is prepared to recognize that expectation as objectively reasonable." *United States v. Eckart*, 569 F.3d 1263, 1274 (10th Cir. 2009) (quotations omitted).  In cases where a defendant is not the registered owner of a vehicle, while he "need not submit legal documentation showing a chain of lawful custody from the registered owner to himself," he nonetheless "bears the burden of establishing that he gained possession from the owner or someone with authority to grant possession." *United States v. Valdez-Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003).  The Tenth Circuit has articulated three factors that it believes are "important, though not determinative" in resolving whether a defendant has met his burden in such circumstances: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle." *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000).  However, the Circuit has also "found the mere fact of presence in the car, or even possession of the car keys, insufficient

---

of standing.'" *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 140 (1978)); *see United States v. Abreu*, 935 F.2d 1130, 1132 (10th Cir. 1991) (noting that "[a]lthough the question of whether a search and seizure violates the Fourth Amendment rights of defendant is often referred to as 'standing,'" the doctrine is subsumed within substantive Fourth Amendment law); *United States v. Pack*, 612 F.3d 341, 347 (5th Cir. 2010) ("Because Fourth Amendment rights are personal, the Supreme Court has stated that there is no useful analytical purpose to be served by considering a matter of standing distinct from the merits of a defendant's Fourth Amendment claim.").  The consequence of this explanation is that courts addressing objections to searches or seizures need only look to the applicable Fourth Amendment jurisprudence and bear in mind that "Fourth Amendment rights are personal, and, therefore, 'a defendant cannot claim a violation of his Fourth Amendment rights based only on the introduction of evidence procured through an illegal search and seizure of a third person's property or premises." *United States v. DeLuca*, 269 F.3d 1128, 1131 (10th Cir. 2001) (quoting *United States v. Erwin*, 875 F.2d 268, 270 (10th Cir. 1989)).

to meet the defendant's burden of proving standing." *Id.* (citing *United States v. Arango*, 912 F.2d 441, 444 (10th Cir. 1990)).

The government argues in its supplemental brief that Mr. Barraza lacks standing to bring his claim. Doc. 60, Gov. Suppl. Mot., at 2. According to the government, to prove standing, Mr. Barraza must assert that he was in lawful possession of the Cadillac where the illegal firearm was found, and here, no standing exists because the car was not registered to Mr. Barraza and Mr. Barraza has not proven that Ms. Herrera, the car's owner, authorized Mr. Barraza to take custody of the vehicle on the day in question. *Id.* At the hearing, Ms. Herrera, the registered owner of the Cadillac, testified that Mr. Barraza had a lawful possessory interest in the vehicle. Doc. 63, Hearing Tr., at 7. In particular, Ms. Herrera stated that she had left the car in Albuquerque, even though she lived and worked in Alamogordo, for Mr. Barraza to use. *Id.* She further testified that Mr. Barraza was paying her in installments for the vehicle with the intention of effecting a transfer of title. *Id.* at 8–9.

As a result of Ms. Herrera's testimony, it is clear that Mr. Barraza "had a legitimate possessory interest in the vehicle." *Allen*, 235 F.3d at 489. In particular, Ms. Herrera's testimony demonstrates that on the day of the search, Mr. Barraza was either the owner or "gained possession [of the Cadillac] from the owner." *Valdez-Hocker*, 333 F.3d at 1209. Because Mr. Barraza had a legitimate possessory interest in the vehicle at the time the search occurred, Mr. Barraza has standing to challenge the search.

## II.     The Impoundment and Inventory Search of Ms. Herrera's Cadillac

Mr. Barraza raises two arguments against the inventory search conducted in this case. First, Mr. Barraza asserts that the impoundment of the vehicle was unconstitutional because it

either failed to follow the appropriate policies or was not justified by an appropriate community-caretaking rationale.  Doc. 45, Suppression Mot., at 4–11.  Second, Mr. Barraza argues that even if the decision to impound the Cadillac was lawful, the inventory search conducted by the Albuquerque Police Department was not an inventory search at all; instead, the inventory search was a pretext to procure evidence of wrongdoing by Mr. Barraza rather than to inventory the contents of the Cadillac.  *Id.* at 11–14.

A.   The Two-Pronged *Sanders* Analysis Requires that the Decision to Impound the Cadillac Followed a Standardized Policy and a Reasonable Non-Pretextual Community Caretaking Rationale.

Recently, the Tenth Circuit clarified the standard the government must meet in order to prove that the decision to impound a vehicle (and consequently conduct an inventory search) satisfies the Fourth Amendment in  *United States v. Sanders*. 796 F.3d 1241 (10th Cir. 2015). *Sanders* requires the government to prove that the decision to impound a vehicle is justified by both a "standardized policy and a reasonable, non-pretextual community-caretaking rationale." 796 F.3d at 1248 (emphasis added).  The Tenth Circuit further clarified that "either failure alone would be sufficient to establish unconstitutionality[.]"  796 F.3d at 1243. [3]  While the Tenth Circuit did not clearly define under the first element of the test what constituted a "standardized policy," the parties agree that the element is satisfied if Officer Shultz followed Albuquerque

---

[3] The search at issue here occurred before the Tenth Circuit issued its opinion in *Sanders*.  As the government notes in its closing argument, *Sanders* "raised the bar" for inventory searches.  Doc. 67, US Closing Br., at 19 (stating that the contrast pre- and post-*Sanders* case law  "highlights just how much *Sanders* has raised the bar.").  As a result, even if Officer Shultz followed his training from the Albuquerque Police Department, it is possible that the training provided regarding inventory searches does not comport with the Fourth Amendment.  *See* Doc. 67, US Closing Br., at 17.  The Court need not reach this issue to decide the suppression motion in this case.

Police Department Procedural Orders Section 2-48-2 as narrowed by Albuquerque City Code Section 8-5-2-4(A)(7).  Doc. 45, Suppression Mot., at 7; Doc. 51, Opp. to Def. Suppression Mot., at 8.[4]  Regarding the second element of the test, the Tenth Circuit has elaborated five non-exclusive factors that district courts may find useful in determining whether a non-pretextual community-caretaking rationale for the impoundment applies:  "(1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment."  796 F.3d at 1250.[5]

### i.  The Standardized Impoundment Policy

The United States concedes that the rationale for impoundment must comply with both the Albuquerque City Code and the Albuquerque Police Department's standard operating procedure (SOP) for impoundment.  Doc. 51, Opp. to Def. Suppression Mot., at 8 ("Officer Shultz was adhering to APD Standard Operating Procedure (SOP) as narrowed by Albuquerque City Code.");  Doc. 67, US Closing Brief, at 9 (same).  In this case, whether Officer Shultz

---

[4] Although the United States agreed that Albuquerque Police Department Procedural Orders Section 2-48-2 and Albuquerque City Code Section 8-5-2-4(A)(7) both applied here, the United States explained  in its closing argument that in its opinion this was only because the standard operating procedure incorporated the municipal ordinance by reference.  Doc. 67, US Closing Brief, at 9–10 & 9 n.1

[5] The United States has argued that the *Sanders* case only applies to vehicles on private, and not public, property.  Since the Cadillac was parked on the street, the United States does not think *Sanders* should apply in this case.  Doc. 51, Opp. to Def. Suppression Mot., at 8 (citing *Sanders* at 1248–49); Doc. 67, US Closing Br., at 15.  This argument fails. Since one of the factors in *Sanders* is "whether the vehicle is on public or private property," *Sanders* at 1250, the Court should consider whether the vehicle was on public property as <u>one</u> of the factors in rendering its decision.  The United States' reading would render this factor dispositive, rather than simply relevant.

followed a standardized policy turns on the application of both Section 8-5-2-4(A)(7) of the Albuquerque City Code and Section 2-48-2(A) of the Albuquerque Police Department Procedural Orders.

Albuquerque Police Department Procedural Orders Section 2-48-2(A) provides that a vehicle must be towed when:

> The driver has been incapacitated, hospitalized, arrested, or when the vehicle cannot be released to a responsible party.  Officers will not tow if the vehicle is parked at the driver's place of residence, or his/her registered address.

Ex. 6-2, ABQ Police SOPs, at 1.  Focusing on the residence clause, Mr. Barraza argues that Officer Shultz could not have been following the Albuquerque Police Department's standardized policy when he decided to impound the vehicle because Mr. Barraza lived with Ms. Jaramillo at the apartment building where the Cadillac was parked at the time of the arrest.  Doc. 66, Def. Closing Br., at 5–6 ("[Section] 2-48-2 . . . directs officers not to impound a car that is parked at the driver's place of residence") (quotations omitted).  Although the government does not dispute that several months prior to the arrest Mr. Barraza did occupy Unit D in that apartment building with a woman named Jenny, Doc. 63, Hearing Tr., at 108, 118, at some point before the search took place Jenny left Unit D and Mr. Barraza moved his personal property out of Unit D and into Unit A with Ms. Jaramillo and her husband.  Doc. 63, Hearing Tr., at 120.  At the time of the search, Mr. Barraza was staying with Ms. Jaramillo three-to-four nights a week.  *Id.* at 121.  As a result, the United States disputes that Mr. Barraza was a resident of the building, cross-examining Ms. Jaramillo's testimony and offering, through Officer Shultz's rebuttal testimony, that Mr. Barraza's registered address was in Alamogordo.  *Id.* at 117–28, 132.  Ms. Jaramillo testified that Mr. Barraza did not pay Ms. Jaramillo rent and his name was not on the lease, but

he did help Ms. and Mr. Jaramillo with money for food and other household expenditures. *Id.* at

123. Ultimately, the Court need not decide whether Mr. Barraza was a resident of the apartment

building where the Cadillac was parked because, as described below, Officer Shultz did not

comply with Albuquerque City Code when impounding the vehicle.

> Albuquerque City Code § 8-5-2-4(A)(7) states that a vehicle may be towed:

> When the driver or person in control of a vehicle is lawfully taken into custody by
> a police officer, and the person is unable to immediately provide for the custody
> or removal of the vehicle, and the vehicle is left as described elsewhere in this
> division (A), or the location of the vehicle is such that a reasonable person would
> believe that its owner would desire its relocation or removal.

Ex. 7, ABQ City Code, at 4. The government argues that Albuquerque City Code Section 8-5-2-

4(A)(7) allowed impoundment in this case because: (1) Mr. Barraza had been arrested, (2) the

vehicle could not be released to a responsible party, and (3) a reasonable person would have

desired the vehicle's relocation or removal. Doc. 51, Opp., at 8–9. Mr. Barraza contends that (1)

the vehicle could have been released to his sister, (2) the vehicle could have been released to Ms.

Jaramillo on the scene, and (3) the vehicle could have remained where it was under the custody

of Ms. Jaramillo. The government responds that none of these alternatives were legally available

because the vehicle's registration had expired and could therefore not be moved or released. *Id.*

at 9; Doc. 67, US Closing Br., at 11 (noting that Albuquerque City Code § 8-5-2-1 states that a

"vehicle that is not registered or does not display a current valid license plate and validating

sticker shall be deemed inoperable."). However, even if the vehicle is left inoperable, this does

not, in itself, authorize the Albuquerque police department to tow it if it is otherwise legally

parked. Instead, under Albuquerque City Code § 8-5-2-3(D)–(G), the correct procedure for an

inoperable vehicle along a public street is to affix a notification tag and tow the vehicle if it is not

removed within seven consecutive days of the notice.  Ex. 7, ABQ City Code, at 3 (if "the [inoperable] vehicle is not removed within seven consecutive days of the day the notification tag was affixed to the vehicle, the vehicle may be ordered impounded").  As a result, because the vehicle could have been left where it was and the government failed to prove that a reasonable person would have wanted it to be towed, Officer Shultz did not follow the Albuquerque City Code when impounding the vehicle and therefore the impoundment fails to satisfy the first element of the *Sanders* test.

*ii.   The Community-Caretaking Justification for the Impoundment.*

In addition to failing to follow Albuquerque City Code Section 8-5-2 regarding the impoundment of legally parked, inoperable vehicles, the United States has also failed to prove that Officer Shultz had a non-pretextual, community-caretaking justification for impoundment. Here, the government argues that a community-caretaking justification existed because concerns about theft and vandalism meant that the vehicle had to be moved, Doc. 51, Opp., at 12–13, and that no one was legally available to take custody of the vehicle because the registration had expired and it was therefore technically inoperable.  *Id.* at 9 (citing Albuquerque City Code § 8-5-2-1).  Mr. Barraza responds that no community caretaking rational justified impoundment because the car "was parked on a public street in a residential neighborhood . . . . outside the residence of Mr. Barraza's friends" and therefore did not have to be moved.  Doc. 45, Suppression Mot., at 9. Mr. Barraza further argues that even if the vehicle did need to be moved, Mr. Barraza's friend, Ms. Jaramillo, present at the scene, was able to move the car to a secure location.  *Id.* at 7.

In deciding whether a community-caretaking rationale justified impoundment, the five factors enumerated by the Tenth Circuit in the *Sanders* case guide this Court's inquiry.  796 F.3d at 1250 (advising district courts to consider "(1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment.")   Of the five factors enumerated by the Tenth Circuit for considering whether a non-pretextual community-caretaking exception existed, the last three are particularly relevant in this case because the vehicle was impounded on a public street: "(1) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (2) whether the vehicle is implicated in a crime; and (3) whether the vehicle's owner and/or driver have consented to the impoundment."  *Sanders*, 796 F.3d at 1250. Factor two and three clearly cut against impoundment because the vehicle was not implicated in a crime at the time Officer Shultz made the impoundment decision and neither Mr. Barraza nor Ms. Herrera consented to impoundment.

The Court also finds the availability of alternatives in this case weigh against the government.  At the hearing, Mr. Barraza presented substantial evidence regarding the various alternatives to impoundment that were available to Officer Shultz.  In particular, video evidence as well as testimony from Ms. Herrera, Ms. Jaramillo, and Officer Shultz demonstrated that Officer Shultz could have left the Cadillac parked at the curb, Doc. 63, Hearing Tr., at 80, Officer Shultz could have asked Mr. Barraza to move the car into the adjacent parking lot that contained security cameras, *id.,* Officer Shultz could have turned the Cadillac over to Ms.

13

Jaramillo, *id.* at 87, 110–12, 132–33, or Officer Schultz could have left the keys with Ms. Jaramillo for several hours until Ms. Herrera could come to Albuquerque from Alamogordo to take custody of it, *id.* at 112, 114–15.

As an alternative to the Court's analysis of the *Sanders* factors, the government asserts, relying on pre-*Sanders* case law, that the threat of theft and vandalism alone are sufficient to invoke the community-caretaker exception regardless of the Tenth Circuit's five enumerated *Sanders* factors. Doc. 51, Opp., at 12–13. In particular, the government points out that Officer Shultz was implementing a self-developed plan for patrolling the neighborhood for theft and vandalism where the car was found. Doc. 63, Hearing Tr. at 24–25. The government also points out that Mr. Barraza himself expressed concerns about theft and vandalism during police questioning, stating "they'll fucking rob my . . . they'll steal my sister's car, man. . . . Look at the neighborhood." Ex. 3-5; Ex. 3-6. However, once it became apparent to Mr. Barraza that Officer Shultz was not going to give Mr. Barraza back his car, Mr. Barraza stated that he did not want the police to impound it. *Id.*

Outside of the Tenth Circuit, courts are split on whether a police officer's stated concern regarding vandalism is sufficient to justify the community caretaker exception for impoundment. The Ninth Circuit recently held that a car did not create a hazard to others and was not a target for vandalism or theft when it was legally parked before the arrest close to an area where the arrestee would normally park his car. *United States v. Caseres*, 533 F.3d 1064 (9th Cir. 2008). In *Caseres*, the court reasoned that there "was no community caretaking rationale for the impoundment of Caseres's car. The car was legally parked at the curb of a residential street two houses away from Caseres's home. The possibility that the vehicle would be stolen, broken into,

or vandalized was no greater than if the police had not arrested Caseres as he returned home. The government has not presented any evidence that the car was blocking a driveway or crosswalk, or that it posed a hazard or impediment to other traffic[.]"  *Id.* at 1075.  The Seventh Circuit has similarly held, stating that the "suggestion that the police were obliged to impound the vehicle 'to protect it' from theft or vandalism, strikes us as making up new police obligations after the fact where none existed before. The police do not owe a duty to the general public to remove vulnerable automobiles from high-crime neighborhoods[.]"  *United States v. Duguay*, 93 F.3d 346, 352 (7th Cir. 1996).  *See also Sanders* at 1251 n.2 (citing *Duguay* with approval). *But see United States v. McKinnon*, 681 F.3d 203, 209 (5th Cir. 2012) (finding threats of theft or vandalism sufficient).  Furthermore, while a Tenth Circuit decision predating *Sanders* indicates that concerns regarding theft and vandalism may be sufficient to justify impoundment, *United States v. Kornegay*, 855 F.2d 713, 716 (10th Cir. 1989) ("to have left the vehicle in the auction company's parking lot—a lot open to the public—could have subjected it to vandalism or theft."),  the Tenth Circuit specifically addressed its prior precedent in *Kornegay* and resolved this issue in *Sanders* by cautioning district courts that while sometimes the vandalism and theft rationale is legitimate, often "the position of a vehicle in a 'high-crime area' <u>may well be a source of pretext</u>, particularly when, as in this case, the owner or driver of a vehicle expresses a willingness to accept the risk of a break-in."  *Sanders*, 796 F.3d at 1251 n.2 (10th Cir. 2015) (emphasis added).

Here, Mr. Barraza was willing to accept the possibility of break-in, stating that the car could be left where it was until Ms. Herrera could come and pick it up.  Ex. 3-5; Ex. 3-6. Furthermore, *Sanders* makes it clear that courts are to apply the five non-exclusive factors

enumerated in determining whether a community-caretaking rationale existed, and cannot rely on police fear of vandalism alone in justifying impoundment. *Sanders*, 796 F.3d at 1250. As stated above, the totality of the circumstances, when viewed in light of the five *Sanders* factors, indicate that no community caretaking rationale existed to justify the impoundment.

Because Officer Shultz did not follow the Albuquerque City Code by adequately considering alternatives to impoundment and because no community-caretaking rationale existed to justify impoundment under the *Sanders* factors, the decision to impound, and subsequently search the car, violated the Fourth Amendment.

B. <u>Inventory Searches Following Impoundment Must Be Conducted According to Standard Procedures and for the Purpose of Protecting the Car and Its Contents.</u>

Even if Officer Shultz had been correct in deciding to impound the Cadillac, the Tenth Circuit has held that in addition to proving that the impoundment of a vehicle is legitimate, the government must also prove that the inventory search itself was legitimate. *United States v. Lugo*, 978 F.2d 631, 636 (10th Cir. 1992); *see Kornegay*, 855 F.2d at 716 (adjudicating the appropriateness of an impoundment decision separate from the reasonableness of the search). In *Lugo*, the Tenth Circuit outlined a two-factor test for determining whether an inventory search was properly conducted, stating: "When the police acquire temporary custody of a vehicle, a warrantless inventory search of the vehicle does not offend Fourth Amendment principles so long as the search is made pursuant to 'standard police procedures' and for the purpose of 'protecting the car and its contents.'" 978 F.2d at 636 (*citing Dakota v. Operman*, 428 U.S. 364 (1976)). As such, "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence," but rather "should be designed to produce an inventory" and not "a purposeful and general means of discovering evidence of a crime[.]" *Florida v. Wells*,

495 U.S. 1, 4 (1990) (quotations omitted).  The scope of the inventory search cannot exceed what is necessary to effectuate the purpose of the exception to the warrant requirement, "to protect the owner's property" and to "protect[] the police from accusations of stolen, lost, or damaged property." *Caseres*, 533 F.3d at 1074 (*citing Opperman*, 428 U.S. at 372–74).  And the Tenth Circuit has suppressed searches when the evidence showed that their purpose was not "to record defendant's belongings" and "to protect police from potential liability," *United States v. Edwards*, 632 F.3d 633, 644 (10th Cir. 2001), or when the search "does not serve the purpose of 'protecting the car and its contents' under any normal construction of those terms." *Lugo*, 978 F.2d at 637.   As both parties pointed out in their briefing, this Court recently suppressed the results of an inventory search wherein the police discovered contraband contained within the utility console of a vehicle, where the console was not a factory-made storage area intended for consumer use.  *United States v. Chavira*, No. 14-CR-03091, 2015 WL 9943583, at *3–4 (D.N.M. Oct. 6, 2015) (Vázquez, J.).

Mr. Barraza asserts that even if the impoundment of the Cadillac was lawful, the search conducted went beyond the scope of a reasonable inventory search.  In particular, Mr. Barraza points to Albuquerque Police Department Procedural Orders Section 2-17-14(d) to highlight the standardized criteria for searches (rather than impoundment, addressed above) that the Officer Shultz purportedly did not follow.  Doc. 45, Suppression Mot., at 13.  Section 2-17-14 provides criteria as follows:

A.  Vehicles must be in lawful police custody;
B.  Must be reasonable and conducted in good faith;
C.  Will be conducted by the public, officers, or public safety aides in accordance with their training and [Albuquerque Police Department] standard operating procedures;

D. Inventory searches will include the entire passenger compartment, glove box, trunk, and containers without damaging the property, at or near the time the vehicle was lawfully placed in police custody. . . . ;

E. The Inventory search will be documented and become part of the original Offense/Incident Report. If towed, an inventory search will be conducted of the vehicle and will be documented on the Tow-in Report form.

Albuquerque Police Department Procedural Orders § 2-17-14.  Here, testimony offered at the hearing indicates that Officer Shultz suspected that stolen property was in the car before he conducted the search.  Doc. 63, Tr., at 41, 48.  And the video of the search taken by Officer Shultz indicates that both officer Shultz and the other officer searching the vehicle left bags and containers unopened, generally discarded items, and rummaged through the car rather than sorting and categorizing its inventory.  *See generally* Ex. 3-7.  Furthermore, the 'Tow-In Report' completed by the Albuquerque Police Department lists a mere nine items taking up less than two of the available lines on the form, despite what the government admits was a substantial amount of property inside the vehicle.  Ex. 5; Doc. 63, Hearing Tr., at 41 (the vehicle contained a "large amount of property.  The entire back seat was, I would say, piled with property: Clothing, electronics, tools, anything you could think of . . . there was a lot of property in there.").  Finally, after Officer Shultz discovered contraband inside the car, another officer on the scene stated "this is why we just tow the cars," further indicating that this was a search for contraband, and not an inventorying of the car's contents.  Ex. 3-7.  As a result, the government has not met its burden of proving that the inventory search itself was reasonably conducted to create an inventory of the contents of the vehicle rather than search it for contraband.

**III.    The Government's Alternative Justification of the Search under the Automobile Exception to the Warrant Requirement**

The government argues that even if the search was unlawful as an inventory search prior to impoundment, the search was still valid as an evidentiary search under the "automobile exception" to the warrant requirement because Officer Shultz had probable cause to suspect that evidence or contraband was inside the car.  Doc. 51, Opp. to Def. Suppression Mot., at 13.  The probable cause initially offered by the government is: (1) the "odd" manner in which Mr. Barraza looked at Officer Shultz, (2) the expired registration on the car, (3) Mr. Barraza's nervousness upon being approached by Officer Shultz, (4) the false information Mr. Barraza gave to Officer Shultz, (5) Mr. Barraza's attempt to flee the vehicle, and (6) Mr. Barraza's proffered alternatives for what to do with the Cadillac.  *Id.* at 13–14.   After the hearing, the government offered as additional probable case that Mr. Barraza had a warrant out for his arrest for theft and there was a substantial amount of property in his back seat that could have been stolen, including electronics.  Doc. 67, US Closing Br., at 23–24; Doc. 63, Tr. at 41, 48.  Mr. Barraza argues that no probable cause existed, as evidenced by the government's decision to conduct an inventory search instead of an evidentiary search pursuant to the automobile exception and failure to contact a judge to procure a warrant.  Doc. 52, Reply ISO Suppression Mot., at 5–6.

Police officers can search an automobile without a warrant when they have probable cause to believe it contains evidence of a specific criminal activity.  *California v. Acevedo*, 500 U.S. 565, 580 (1991).[6]  Regardless of whether a warrant is obtained, for probable cause to search a vehicle to exist, the officer conducting the search must "have the *specific* factual knowledge

---

[6] The fact that the Cadillac was stationary does not impact the scope of the automobile exception.  *United States v. Ludwig*, 10 F.3d 1523 (10th Cir. 1993).

that justifies a search or arrest[.]"  *United States v. Huff*, 782 F.3d 1221, 1226 (10th Cir. 2015) (emphasis added), *cert. denied*, 136 S. Ct. 537 (2015).  Probable cause when searching vehicles requires "not merely that something incriminating will be found . . . , but rather that certain fruits, instrumentalities, or evidence of crime which can be and are particularly described are to be found there."  WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 7.2(C) (5th ed. West 2012); *cf. United States v. Dimick*, 990 F.2d 1164, 1165–66 (10th Cir. 1993) (affirming suppression of evidence because the officer conducting the search only had reasonable suspicion sufficient to justify an investigative detention and not the search of a train car).  In determining whether probable cause for the search existed, "the relevant question is whether a 'substantial probability' existed that the suspect committed the crime[.]"  *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011).

The Tenth Circuit has held that probable cause to search a vehicle without a warrant existed when a defendant's five visits to a tire store coincided with taped phone calls regarding the sale of drugs during those five occasions, *United States v. Benard*, 680 F.3d 1206, 1210 (10th Cir. 2012), when a trained drug-sniffing dog smelled from outside a vehicle that a vehicle contained drugs, *United States v. Parada*, 577 F.3d 1275, 1281 (10th Cir. 2009); *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 880 (10th Cir. 2014), and when the driver of a vehicle voluntarily admitted that there was contraband inside the vehicle.  *United States v. Bradford*, 423 F.3d 1149, 1159 (10th Cir. 2005) (probable cause to search for further evidence of marijuana existed where driver admitted "she had a marijuana pipe and a small bag of marijuana in the car" and produced the same to the officer).  However, the Tenth Circuit has denied that probable cause to search a vehicle exists when the smell of drugs indicates drug usage, rather than drug

trafficking.  *United States v. Wald*, 216 F.3d 1222, 1226 (10th Cir. 2000) ("the smell of burnt marijuana is indicative of drug usage, rather than drug trafficking, and because it is unreasonable to believe people smoke marijuana in the trunks of their cars, the mere smell of marijuana does not create the fair probability that the trunk contains marijuana").  Furthermore, the Tenth Circuit has also affirmed that nervousness and inconsistencies in a defendant's story are not in themselves sufficient to justify the warrantless search of a vehicle.  *Felders v. Malcolm*, 755 F.3d 870, 883 (10th Cir. 2014) (inconsistencies insufficient); *United States v. Wood*, 106 F.3d 942, 946–48 (10th Cir. 1997) (inconsistencies, failure to accurately recall travel itinerary, and extreme nervousness not sufficient, stating "we have repeatedly held that nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on . . . nervousness . . . as a basis for reasonable suspicion . . . must be treated with caution.").

Here, Officer Shultz testified that he suspected that Mr. Barraza had stolen electronics in the car. Doc. 63, Hearing Tr. at 41, 48.  Officer Shultz testified that he based that suspicion on the fact that Mr. Barraza had previously been arrested for armed robbery, that electronic equipment was included on the impoundment list, and Mr. Barraza had left the rear window cracked such that Officer Shultz could see inside the car when he approached Mr. Barraza.  *Id.* at 99–103.  Mr. Barraza also opened the door when he talked to Officer Shultz, expanding Officer Shultz's field of vision and allowing him to see further into the backseat.  *Id.*

Upon reviewing the videotape of the arrest and subsequent search, Officer Shultz appears to be mistaken in his recollection.  It appears that there was no electronic equipment found in the backseat other than a laptop buried under a significant amount of clothes and other property.  Ex. 3-7.  Although the Tow-In Report does list several electronics in addition to the laptop, including

"HP LAPTOP – . . . SPEAKERS –  NAVIGATION DASH STEREO," Ex. 5, none of those electronics were found on the back seat.  Instead, it appears that the speakers, which appear to be the only electronics not on the dashboard or buried under the clothes in the backseat, were found in the back-right corner of the trunk, which was not visible at the time Officer Shultz made the decision to search the car.  Ex. 3-7.  This fits with what the supervisors and detectives on the scene stated, which is that "we can't tell for sure that there's stolen property or a firearm inside the vehicle just from looking at it."  Doc. 63, Hearing Tr., at 49–50.

As stated above, the law requires that probable cause for the search be specific to the items searched for.  General suspicions of lawlessness, e.g., arising from Mr. Barraza's flight, are not sufficient in themselves to give Officer Shultz probable cause to search the vehicle to determine why Mr. Barraza was running.  *Huff*, 782 F.3d at 1226; WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 7.2(C) (5th ed. West 2012).  Because the only specific item of potential contraband Officer Shultz suspected was in the car was stolen electronics, and there was no way for Officer Shultz to have specific, factual knowledge that stolen electronics were inside the car, there was no probable cause for Officer Shultz to search the car.  As a result, the government's alternative justification for the search, probable cause to search for suspected contraband, is unavailing.[7]

---

[7] The finding that there was no probable cause here is further buttressed by Officer Shultz's own assertion that he did not think that he had probable cause at the time at the time of the search. Officer Shultz stated at the hearing that before conducting the search he consulted with several other law enforcement personnel on the scene, who concluded that no probable cause existed. Doc. 63, Hearing Tr., at 49–50.

The timing of this determination further indicates that the inventory search here was pretextual.  First, Officer Shultz tried to determine with other law enforcement personnel if he

## IV.    Mr. Barraza's Custodial Interrogation

Mr. Barraza has asserted that Officer Shultz did not adequately read him his *Miranda* rights, and as a result Mr. Barraza did not have an appropriate opportunity to assert them. "Under Miranda, law enforcement officers must advise a suspect who is subjected to custodial interrogation that he has the right to remain silent, that statements can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed." *United States v. McCluskey*, 893 F. Supp. 2d 1117, 1138 (D.N.M. 2012).  *See also Missouri v. Seibert*, 542 U.S. 600, 608 (2004) ("failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained.").  Any "waiver of one's Fifth Amendment privilege against self-incrimination must be made voluntarily, knowingly and intelligently."  *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008) (internal quotation marks omitted).  "Whether this standard is met depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."  *Id.*  The government bears the burden of proving an effective waiver by a preponderance of the evidence.  *United States v. Morris*, 287 F.3d 985, 988 (10th Cir. 2002).  In particular, for a waiver to be valid, the Court must satisfy itself that it was made "with a full awareness of both the nature of the right being abandoned and the consequences of

---

had probable cause to search the vehicle, only to discover that he did not have probable cause for a search.  Only after learning that he could not procure a warrant to search the Cadillac did Officer Shultz decided to impound the vehicle and conduct an inventory search that produced contraband.

the decision to abandon it." *Burson*, 531 F.3d at 1257.   The Tenth Circuit has emphasized two

features of this analysis:

> First, the relinquishment of the right must have been voluntary in the sense that it
> was the product of a free and deliberate choice rather than intimidation, coercion,
> or deception. Second, the waiver must have been made with a full awareness of
> both the nature of the right being abandoned and the consequences of the decision
> to abandon it.   Only if the totality of the circumstances surrounding the
> interrogation reveals both an uncoerced choice and the requisite level of
> comprehension may a court properly conclude that the *Miranda* rights have been
> waived.

*Morris*, 287 F.3d at 988.

Mr. Barraza argues that he was not properly read his *Miranda* rights during his custodial

interrogation because Officer Shultz "did not explain all the rights available to Mr. Barraza" and

therefore Mr. Barraza "could not waive those rights he did not know about."   Doc. 45,

Suppression Mot., at 15.   In particular, Mr. Barraza claims that Officer Shultz did not tell him

that he could stop talking at any time or that he could ask for a lawyer at any time, instead telling

him that he could refuse to talk or ask for a lawyer before the interrogation began.   Doc. 51,

Opp., at 14–15; Doc. 52, Reply ISO Suppression Mot., at 6–7.   The government contends that

Officer Shultz did provide Mr. Barraza with the appropriate information, and that regardless, the

Supreme Court has stated that a "pared down version of the Miranda warnings [is] sufficient[.]"

Doc. 51, Opp., at 18 (citing *Florida v. Powell*, 559 U.S. 50 (2010).

Here, the recording of Mr. Barraza's arrest demonstrates that Mr. Barraza was read his

full complement of Miranda rights as provided by Officer Shultz's Miranda card, which was

provided to him at the police academy.   Doc. 63, Hearing Tr., at 53.   The video footage taken

demonstrate that Officer Shultz pulled out the card from his pocket and read it, verbatim, to Mr.

Barraza.   The Court has reviewed the Miranda card, and it appears to accurately state that Mr.

Barraza had "the right to remain silent, that statements can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed." *United States v. McCluskey*, 893 F. Supp. 2d 1117, 1138 (D.N.M. 2012). As a result, Mr. Barraza cannot argue that he was not read his full complement of rights.

Two elements of Mr. Barraza's Mirandizement remain troubling.[8] However, since the parties did not brief these issues and because the statements are nevertheless being suppressed (as explained below), the Court need not further address the legality of Mr. Barraza's Mirandizement.

## V.   Suppression of the Results of the Inventory Search and Post-Arrest Statements

Where a defendant demonstrates that his "Fourth Amendment rights were violated" and that there is a "factual nexus between the illegality and the challenged evidence" such that "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct," the evidence in question may be tainted and, therefore, subject to suppression. *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006) (internal

---

[8] First, Mr. Barraza was not Mirandized until well after his arrest and long after the interrogation started. Ex. 3-5. After Mr. Barraza fled his car, Officer Shultz gave chase, caught Mr. Barraza, and handcuffed him, effectively effectuating an arrest. Doc. 63, Hearing Tr., at 35–37. Immediately thereafter, Officer Shultz and other members of the Albuquerque Police Department proceeded to question Mr. Barraza extensively regarding, among other things, "why [he was] running" and "what [he was] doing in the car?" Ex. 3-4. Upon realizing that Mr. Barraza had not been Mirandized, Officer Shultz uttered an exclamation and immediately attempted to Mirandize Mr. Barraza. Ex. 3-5. Regardless, extensive interrogation occurred without informing Mr. Barraza of his rights.

Further troubling this Court is that, immediately upon Mirandizing Mr. Barraza, Officer Shultz threatened to tow Mr. Barraza's vehicle and immediately began negotiating with him regarding the possible towing. By implication, should Mr. Barraza have chosen not to answer Officer Shultz, his car would have been towed and (in Mr. Barraza's mind) Mr. Barraza may have forfeited his property. Resultantly, the circumstances regarding Mr. Barraza's interrogation do not obviously reveal "an uncoerced choice" to waive his *Miranda* rights. *Morris*, 287 F.3d at 988.

quotation marks and citations omitted); *United States v. Martinez*, 696 F. Supp. 2d 1216, 1236-37 (D.N.M. 2010) ("For the exclusionary rule to apply, the defendant need show only, by a preponderance of the evidence, a constitutional violation, and a causal nexus between the violation and the evidence sought to be excluded.").  Here, as explained above, it is clear that Officer Shultz discovered the unlawful firearm in Mr. Barraza's backseat as a direct result of an unjustified impoundment and an unreasonable inventory search.  Because the firearm would not have come to light "but for the government's unconstitutional conduct," suppression of the firearm is warranted.  *Torres-Castro*, 470 F.3d at 999.

The suppression of the post-arrest statements are a closer call because it is clear from Mr. Barraza's pre-Mirandizement interrogation that the officers at the scene of the arrest intended to ask Mr. Barraza about the contents of the vehicle and the reason for his ill-attempted flight.  *See* Ex. 3-4; Ex. 3-5.  In the Tenth Circuit, it is well established, that "even if" a defendant "can demonstrate that the [challenged] evidence resulted from" an unconstitutional search, the "government may avoid suppression by demonstrating that the evidence would have been inevitably discovered, that it was discovered by independent means, or that it was so attenuated from the illegality as to dissipate any taint from the Fourth Amendment violation." *Torres-Castro*, 470 F.3d at 999.

As this Court has explained before, to "determine whether evidence obtained by officers subsequent to an illegal detention was purged of the taint from an unlawful intrusion, courts apply the analysis set forth in *Brown v. Illinois*." *United States v. Robinson*, 932 F. Supp. 1271, 1278 (D.N.M. 1996) (Vázquez, J.).  "In *Brown*," this Court continued, "the Supreme Court identified three factors relevant to" this analysis: "1) the temporal proximity of the statements to

the Fourth Amendment violation; 2) the existence of intervening causes between the violation and the statements; and 3) the purpose or flagrancy of the official misconduct." *Id.*; *see also Torres-Castro*, 470 F.3d at 999 (also applying the *Brown* factors).  The "heavy burden" rests squarely with the government to establish, based on the totality of the circumstances, that there has been "'a sufficient attenuation or break in the causal connection" between the illegal search and the contents of the interrogation.  *United States v. Fox*, 600 F.3d 1253, 1259 (10th Cir. 2010) (quoting *United States v. Gregory*, 79 F.3d 973 979 (10th Cir. 1996)).  In this case, none of the factors favors admission of the evidence, such that the government cannot meet its burden.

First, the "temporal proximity" factor does not weigh in favor of finding that the "taint" of the unconstitutional impoundment and subsequent search has been "purged" regarding Mr. Barraza's post-arrest statements.  Courts have found that the meaning of this factor is "ambiguous" and "must be considered in light of the conditions and circumstances that occurred during the time frame in question."  *United States v. Shaw*, 464 F.3d 615, 628 (6th Cir. 2006). Here, because the statements by Mr. Barraza occurred close in time to the unconstitutional search, there is more likely to be a "factual nexus between the illegality and the challenged evidence" which inclines this Court toward suppression.  *See Torres-Castro*, 470 F.3d at 999.

Second, while there are potential "intervening circumstances" that would abate the effect of the illegal search, it is not clear that the government has met its burden in proving that Mr. Barraza's testimony would have inevitably been elicited.  While it is true that in rare cases thorough and competent *Miranda* warnings, such as those issued by Officer Shultz in this case, may constitute an "intervening circumstance," they are generally not sufficient, without more, to break the causal chain.  *See, e.g.*, *Fox*, 600 F.3d at 1260; *Kaupp v. Texas*, 538 U.S. 626, 633

(2003) ("we held in *Brown* that *Miranda* warnings, *alone* and *per se,* cannot always . . . break, for Fourth Amendment purposes, the causal connection between the illegality and the confession."). The Court finds that here, the *Miranda* warnings cannot outweigh the fact that the Albuquerque Police Department did not get Mr. Barraza to confess to ownership of the seized firearm until its officers referred specifically in their questioning to illegally obtained evidence. *See, e.g.*, *United States v. Shetler*, 665 F.3d 1150, 1158 (9th Cir. 2011) (noting the issues associated with officers "confront[ing] the suspect, either physically or verbally, with the evidence that has been illegally obtained" and a suspect's "knowledge that the officials had already seized certain evidence"). Here, any purgative effect associated with *Miranda* are simply overwhelmed by the corrupting influence of the tainted evidence on the interrogation.

Third and finally, the conduct by the Albuquerque Police Department in this case appears to have been dedicated to conducting a warrantless investigation. As discussed above, Officer Shultz only made the decision to impound the vehicle after conferring with the other officers on the scene and determining that no probable cause existed to search the vehicle. Doc. 63, Hearing Tr., at 49–50. Additionally, another officer with the Albuquerque Police Department stated, after finding the firearm that "this is why we just tow the cars," indicating, as the Tenth Circuit suspected in *Sanders*, that impoundment decisions by law enforcement are being commonly used to circumvent the Fourth Amendment requirement that law enforcement obtain search warrants. Ex. 3-7. Finally, by repeatedly insisting that the alternatives offered by Mr. Barraza and Ms. Jaramillo to impoundment were unavailable (and by deciding to impound a legally parked car), it appears that the Albuquerque Police Department was simply using the impoundment as a pretext

to discover why Mr. Barraza ran from the vehicle and presented false identification when confronted by law enforcement.

CONCLUSION

Analysis of the factors articulated by the Tenth Circuit in *United States v. Sanders* lead this Court to conclude that the impoundment and attendant inventory search of the Cadillac were mere pretexts for an unconstitutional investigative search.   Any evidence and statements Mr. Barraza made to the Albuquerque Police Department were also a product of this initial illegality and, therefore, must also be suppressed.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence [Doc. 45] is **GRANTED.**

DATED this 27th day of June, 2016.

_____
MARTHA VAZQUEZ
United States District Judge